St. Louis & S. F. Ry. Co. *v.* Bridges.

(Division B. Jan. 6, 1930. Suggestion of Error Overruled February 3, 1930.)

[125 So. 423. No. 28197.]

**D. W. Houston, Sr. & Jr.**, of Aberdeen, **J. W. Canada**, of Memphis, Tenn., and **E. T. Miller**, of St. Louis, Mo., for appellant.

208

Geo. T. Mitchell, of Tupelo, and Lake Hays, of Memphis, Tenn., for appellee.

Argued orally by **D. W. Houston, Sr.**, for appellant, and by **Geo. T. Mitchell**, for appellee.

**Griffith, J.**, delivered the opinion of the court.

In the city of Memphis, appellant maintains and operates a large switchyard, called the Yale yard. This yard is what is known as a freight classification gravity yard, and is designed and used for breaking up incoming freight trains, and in assembling the several cars thereof into classified tracks, according to the ultimate destination of the respective cars. There are eighteen of such separate classification tracks, but for the purpose of this case tracks numbered eleven and twelve only are necessary to be particularly mentioned.

The general design of this yard is such that a switch engine on the rear will push the freight train along a main switch track up to a slight elevation, or hump, as

it is termed, and an employee, called the "pin-puller," will at this hump detach the foremost car, whereupon the engineer will give the train a slight impulse or shunt sufficient to send the detached car over and beyond the hump at a speed of from three to five miles an hour, and the car thus shunted will run, by the impulse given and by gravity, down a grade of one and one-half per cent in the track after passing the hump until the intended classification track is reached, in which track the grade is only one-half of one per cent whereby the car slackens and in a short distance will come to a standstill.

The cars, in shunting and in detaching them, are spaced about seventy-five to one hundred feet apart, and, as they follow each other at approximately that distance apart, there is stationed, farther down the tracks, an employee, called the "short field man," whose duty it is to throw the switches on the main tracks, which switches are about seventy-five to eighty feet apart, so as to send each car, as it arrives, into the particular track to which it belongs. After the several cars get each into its own track there is another employee, called the "long field man," who follows such of them as may be necessary, and by the use of the hand brakes causes each to stop at or near the proper positions.

On the morning of August 12, 1928, at about three forty o'clock, appellee was serving as the long field man. He was an experienced switchman, and had worked in this particular yard in that capacity since the opening thereof, about two or three months prior to that date. There was being broken up a train of twenty-five cars, of which three were to go into track eleven and five into track twelve. Two were to go into track eleven before the first of the five aforesaid was to go into track twelve. When the first car came into track eleven, some question arose between the appellee and the short field man whether there was room for the second track eleven car to enter and leave enough space for the first car for

track twelve to clear. In order to cause a car to enter track twelve, a switch had to be thrown to turn the car off of and from track eleven. Appellee at this juncture went on top of the first car that had come down on track eleven, in order to attend the brakes on that first car, and while thus engaged the second car for track eleven came at the rate of about four miles per hour and moved up in contact with the said first car. The next car due was one which was intended for track twelve, and which, as stated, should have been turned into track twelve by the throwing of a switch in track eleven. In order to throw such a switch, however, there must be a space between the cars sufficient after one has passed to allow the switchman to complete the operation of throwing the switch before the next car arrives. But, when the switchman attempted to throw the switch on this occasion to turn the track twelve car into that track, he discovered that this car was traveling at such an unusual and high rate of speed that it had, when it arrived at the switch, nearly caught up with the car ahead of it, as a result of which the short field switchman was unable to throw the switch, and the said rapidly moving car ran on down track eleven, and crashed into the car which was then against the car on which appellee was standing, thereby hurling appellee from said car to the ground, where he was run over by the runaway car. Appellee's right arm was crushed above the elbow, and he was otherwise injured.

Appellee sued under the Federal law (45 U. S. C. A., sections 51-59) applicable to interstate railway employees, averring that the injury was the proximate result of negligence on the part of appellant—that is to say, that the rate of speed at which the said car intended for track twelve was, instead, sent past said track twelve, and thence down track eleven into collision with the two cars on track eleven, was an unusual and dangerous rate, and was the result of the negligence of appellant's employees other than appellee—while appellant to maintain the issues in its behalf contended that the occur-

rence was a simple accident without negligence, or in any event was an accident the risk of which appellee assumed by virtue of his employment at the place and in the situation described.

The details of the case are numerous, and the various points of argument have required a printed brief in behalf of appellant of nearly one hundred pages. The above statements are therefore only a thumb-nail sketch. It seems to us, however, that, reduced to the final analysis, the case gets to this:

(1) That the speed at which the car causing the injury was traveling was at least ten miles per hour and perhaps as much as twelve to fourteen is established by the evidence.

(2) That a speed, in switching freight cars, of exceeding five or at most six miles an hour is not only dangerous, but is extraordinarily so, is shown by the evidence, and besides is a matter concerning which the jury, from common observation of familiar objects, could judge to that effect even without direct or expert evidence on the subject.

(3) That the excessive speed at which the offending car was traveling was the immediate and efficient cause of the injury is established by the evidence.

(4) It remains then only to determine whether (a) the said excessive speed was the result of negligence on the part of appellant; and, if so, (b) whether it was in respect of a risk assumed by appellee.

We approach the latter inquiries at once by way of the obvious consideration that, within the range of reasonable probabilities, a detached, loaded freight car could have been running at the rate of speed mentioned only by one of the two following causes: (1) By reason of an excessive and therefore a negligent impulse imparted to it by the engineer in sending it forward into these switch tracks; or (2) by reason of an excessive grade in the layout of the switch tracks, a grade so steep that it would by the force of gravity accelerate a loaded car into said excessive and dangerous speed, al-

though the original impulse was only that which was enough to start it at the reasonable or proper rate of from three to five miles per hour.

If the latter hypothesis be taken as stating the true cause in this case, then we may further assume that there would be no legal liability under the Federal law, because the said cause would be that of a permanent and continuing defect in the construction and maintenance of this yard and of this system of tracks there, and, being permanent was one with which appellee, the injured employee, was well acquainted, and who we may assume, therefore, knew of its defects and dangers in the respect mentioned equally as well as the employer. Ry. Co. v. Allen, 276 U. S. 165, 48 S. Ct. 215, 72 L. Ed. 513.

The proof touching the said hypothesis is that the grade for a distance of approximately four hundred feet is one and one-half per cent, but no evidence of experts was given the jury whether a grade of this per cent would accelerate a loaded car, or, if so, how much, and, it not being a matter of common knowledge or of ordinary observation, we are unable to make application of it. There was proof in behalf of appellant that occasionally, or perhaps often, a loaded car would overtake an unloaded car, but this fact is not sufficient to show that the per cent of grade mentioned would operate to cause, or to the extent of causing, an acceleration up to the dangerous speed aforesaid. Proof of no more than that a loaded car would sometimes overtake an unloaded car falls short of proving that the overtaking car would, in order to do so, be running up to the dangerous rate of ten to fourteen miles per hour, for it fails to contain the other necessary factor of how fast the car overtaken was running. The only other proof, which we think may be dependably taken as touching directly upon the point now being dealt with, is the testimony of appellee, disputed by appellant, that a car on these tracks, although heavily loaded, will not accelerate so as to catch up with another car unless the overtaking car was either sent forward without allowing the necessary space between

the car as detached, or else was shunted by the engineer with an excessive impulse, which latter testimony of appellee, if believed and adopted, would pass us from the hypothesis secondly stated into the first, and the first would, under the facts in this case, entail liability.

Now to avoid the first hypothesis, namely, that the cause of the excessive speed of the offending car was an excessive and therefore a negligent impulse from the engine, the appellant was obliged to ask the jury to disbelieve the last aforementioned testimony of appellee and to find that the excessive speed came not from an excessive engine impulse, but resulted from the operation of gravity, which, in other words, is that it came from the gradient in the layout of these switch tracks. And that exactly would be to find that the railroad company was not guilty of the temporary negligence of kicking this car at an excessive and dangerous rate, but that rather it was guilty of the permanent negligence of constructing and laying out this modern switchyard with such dangerous grades as to make it a death trap, yet one about which, because of its permanency, the railroad company could plead assumption of risk. Rather than believe that a great railway system would, with its highly competent civil engineers, deliberately lay out an important switchyard in such a reprehensible manner, would not an average jury the more readily and the most justly conclude, upon any fair evidence to sustain that conclusion, that it was not the expertly planned and deliberately constructed yard that was at fault, but was the unpremeditated and unguarded negligence for the moment of the locomotive engineer?

Indeed, none of the employees upon or near the switch engine definitely or positively testified that this particular car was not shunted with an impulse that of itself produced the speed mentioned. Neither of them testified as to the particular rate of speed with which this particular car was sent forward when detached from the train. Their testimony was only that it was handled in the usual and customary manner, and not in such a

manner as to be dangerous. But if it was intended by them thereby to testify that it was usual and customary or even that such was frequently the case, to shunt cars at the rate of from ten to fourteen miles per hour, it is enough to say that this was disputed by appellee, who testified that it was not customary to shunt cars at over three to four miles an hour, which the jury evidently believed, as being that which is the more reasonable and therefore the more believable. If the statements aforesaid of those upon or near the switch engine are to be construed as meaning that the offending car was not shunted at a higher rate than the safe rate of not exceeding from three to five or six miles an hour, then when it is found running at from ten to fourteen miles per hour seven hundred feet further down the track, how did this so happen? By gravity, says appellant, but, as we have already mentioned, appellee disputes that contention when, as an experienced switchman thoroughly acquainted with this yard, he testified not only that this rate of speed is unusual, but that it will not and cannot occur unless the car is excessively shunted, and, as we have also already mentioned, this must appear the more reasonable, for it is hardly believable, unless upon definite proof, of which there is none such in this case, that a modern switchyard would be constructed in such a manner as to produce, out of its own vicious layout, an acceleration of speed so excessive, so manifestly dangerous and destructive.

In this connection we observe that in appellant's brief it is stated that this track twelve car was weighed, and that a car cannot be weighed on automatic scales if running over six miles an hour. A diligent search of the record fails to find support for the claim that this particular car was weighed. No witness definitely so stated, and the original list or tab of the entire twenty-five cars is in the record, and those weighed have the letter ''W'' opposite them. No such notation appears opposite this car. If it had been definitely shown that this car was weighed, it might have changed the entire result of this

case. Again, appellant contends in its brief that no witness other than appellee testified as to the speed of the car at the time of the collision, and appellant argues that the unsupported testimony of appellee on this point is not sufficient because of the disadvantageous position of the appellee at the time of the collision. Appellant apparently overlooked the testimony of its own witness Fallon, the short field man, who not only testified as to the excessive speed, but gave that fact as his excuse for not throwing the track twelve switch. These two vital errors of fact in appellant's argument have had a large part in throwing the whole of appellant's view of the case out of line, as it seems to us.

Without pursuing the details further, as we have not the space, we think there, is no reasonable escape from the conclusion that the evidence on the whole is sufficient to sustain the verdict of the jury on the issue of liability; and this brings us to the amount of the verdict.

The amount of the verdict is forty thousand dollars. This is far beyond any sum which so far as we can find has ever been allowed to stand in this state for a similiar injury, but, for the reasons now to be stated, we express no definite opinion whether the amount was proper in this particular case. The fifteenth and sixteenth grounds of the motion for a new trial presented the question that the verdict is excessive. The trial court entered an order overruling the motion, but inserted in the order the following recital: "And the court having heard and considered said motion states that as to grounds fifteen and sixteen regardless of whatever opinion the court might entertain about the same, the motion will not be sustained for the reason that this court has no power to bind the defendant to pay off and discharge any amount that this court might think reasonable and just; and it is a uniform custom of this court to leave this question for decision and adjudication by the supreme court which has the power to bind both parties to the litigation."

It is a fair inference from the language of the above order entered by the trial court that the trial judge was not satisfied in respect to the amount of the verdict, and it is clear that, while technically he overruled the motion, yet in fact and in actual substance he did not pass on the grounds mentioned. But is it not the inescapable duty of the trial judge not only to pass on every ground of a motion for a new trial, but to award relief therein when in his opinion relief should be granted? Very recently Division A of this court in Gulf, Mobile & N. R. Co. v. Jeannette Jones, 125 So. 114 (No. 28249, December 16, 1929), dealing with this question, said: "By a long line of decisions this court has held that excessive verdicts are within the control of the judges of the trial courts, and they are charged with the duty of awarding relief therefrom." The correctness of this holding is a necessary consequence of the following settled rules: (a) It is for the trial judge to determine in his discretion, viewing the matter in the light of judicial experience and sound legal principle, whether the damages awarded to plaintiff are excessive. 46 C. J., p. 197, and the numerous authorities there cited. (b) An application for a new trial is made in and to the court in which the action is tried, not to the appellate court, 46 C. J., pp. 287-289; and, where the objection that the amount of the recovery is excessive is not made the basis of a motion for a new trial, it is not available on appeal. Coccora v. Light & Tr. Co., 126 Miss. at pages 726, 727, 89 So. 257; Tendall v. Davis, 129 Miss. 30, 91 So. 701; Walker v. Jones, 44 Miss. 623; Phipps v. Nye, 34 Miss. 330; Kelly v. Brown, 32 Miss. 202; 3 C. J., p. 988. (c) "The supreme court can grant a new trial only in such cases as that it was the duty of the lower court to grant a new trial. The supreme court is exclusively a court of appeals, and as such its powers are confined to correcting errors committed in the trial courts. It would be an anomaly for this court to grant a new trial in a case in which the lower court had no such power." Sussman v. Sea Food Co., 130 Miss. 632, 94 So. 795, 796.

Not only are the above principles controlling, but there are further grounds for the rule. The trial judge has personally heard the witnesses and has seen the injured party. This court is entitled to, and must have, the benefit of the sound legal judgment of the trial judge on the question raised by such motion. The parties also are entitled to his honest, impartial, and deliberate judgment, and, unless he has given that judgment in fact, there is nothing in fact before us for review in that respect. It has always been the constitutional policy in this state to withhold from the supreme court any powers except those that are appellate. It is therefore not admissible that a court of original jurisdiction shall in the least or in any respect abdicate any part of its judicial functions or duties in favor of the supreme court, or of any other court; but fully and fearlessly the trial court must determine every issue, seeing all the facts and the law of the case, and nothing of the parties or their counsel, and with the same sense of final responsibility as if there were thenceforth no such thing as a court of appeals and no such thing as an appeal from the judgment rendered.

Inasmuch, then, as the trial judge in this case, as stated, did not in fact, as distinguished from the mere technical effect, act on the issue mentioned, did not exercise actual judgment upon it, we must reverse the judgment, but in so far only as the judgment entered is involved in that error.

The verdict and judgment are therefore affirmed upon the issues of liability; but, as to the amount of the verdict and judgment, the judgment is in that respect reversed, but not the verdict, and the case is remanded, with directions that the trial court take up the consideration of the motion for a new trial on points 15 and 16 thereof, and that, in the light of the principles of adjudication above mentioned, the trial judge will, according to his own judgment, enter one of the following orders:

One. If in his judicial opinion he regard the amount of the verdict as deserving of approval on the present record, he may so order, and enter final judgment thereon.

Two. If he think it should be reduced, he may order a remittitur, and, unless accepted by plaintiff within a reasonable time to be fixed, he will set aside the verdict on the issue of the amount thereof, and order a new trial on that sole issue.

Three. If he deem it to be the better course in the interest of justice, he may lay aside the foregoing options, and at once order a new trial on the same sole issue.

Affirmed in part; reversed in part.